JUDGE STEIN

**07 CIV 9796**

515-07/PJG

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
STARFISH ENTERPRISES INC.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

STARFISH ENTERPRISES INC.

                              Plaintiff,

       - against -

PETROVAL S.A.,

                              Defendant.

-----------------------------------------------------------------x

**07-CV-**

**VERIFIED COMPLAINT**

Plaintiff STARFISH ENTERPRISES INC. (hereinafter "Plaintiff" or "Starfish"), by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Verified Complaint against the Defendant PETROVAL S.A. (hereinafter "Petroval"), alleges upon information and belief as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action arises under the New York Convention

on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et* seq.

2.     At all times relevant hereto, the Plaintiff Starfish was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address in care of Delfi S.A., 14 Skouze Street, 185-36 Piraeus, Greece.

3.     At all times relevant hereto, the Defendant Petroval was and still is a foreign business entity duly organized and existing under the laws of Switzerland with an office and place of business at Avenue Louis-Casai 84, Geneva, Switzerland, but no office or presence within this District.

4.     On or about December 21, 2004, Plaintiff Starfish, in the capacity as owner, entered into a maritime contract of charter party with Defendant Petroval under which Defendant Petroval agreed to charter the M/T KASCO for carriage of a cargo of gasoil to be loaded in Nakhoda and discharged in various/optional safe ports.  A copy of the fixture recap and pro forma charter party is annexed hereto as Exhibit A and incorporated herein by reference.

5.     The subject fixture recap provided, *inter alia*, that the Defendant charterer would only employ the vessel between safe ports always excluding river ports and that it would be governed and construed according to English Law.

6.     Pursuant to the terms of the charter, Plaintiff Starfish tendered the M/T KASCO into the service of Petroval in December 2004 and the vessel commenced trading under the subject charter.

7.     On or about December 29, 2004, the charterer gave instructions for the vessel to proceed to Nakhoda for loading.

8. In January 2005, the charterer issued further instructions for the vessel to proceed to Ho Chi Minh, Vietnam on completion of loading.

9. The vessel completed loading on January 11, 2005 and proceeded toward Ho Chi Minh.

10. Charterer provided regular updates regarding the vessel's ETA in Ho Chi Minh up through January 20, 2005.

11. On January 21, 2005, however the charterer directed the vessel to Cat Lai Terminal, a river port located on the north bank of the Saigon River, about 12 miles east of Ho Chi Minh City.

12. The charterer's decision and order to discharge the vessel at Cat Lai, a river port, was a direct breach by the charterer of the terms of the charter party which specified the vessel was to be employed only between safe ports and always excluding river ports.

13. In addition, in order for the vessel to approach the berth with her starboard side to, tug assistance was required.

14. As the vessel approached the berth with the assistance of two tugs, she collided with Jetty B belonging to Saigon Petro as a result of the unsafe port and berth and the inadequate tugs provided at the port.

15. The collision caused a puncture in the vessel's hull which led to a release of part of the cargo of gasoil into the Dong Nai River.

16. A professional oil spill response service, Dai Minh Consulting Service Pte, was called in to provide oil spill response/salvage services.

17.  The salvage expenses charged by Dai Minh Consulting Service Pte. for the incident have been settled by a payment by Plaintiff to Dai Minh of $40,000.

18.  As a consequence of Petroval's breach of the charter party, Starfish has suffered extensive damages.

19.  The damages suffered by Owners as nearly as can be estimated at this time, include the following items:

| | | |
|---|---|---|
| 1. | Unpaid Demurrage | $ 44,484.38 |
| 2. | Dai Minh Consulting Service Pte. Settlement | $ 40,000.00 |
| 3. | Dai Minh Co. Ltd. response | $ 30,888.47 |
| 4. | CMI Vietnam – damage repair account | $ 27,678.98 |
| 5. | CMI Vietnam – protecting agency account | $  4,470.00 |
| 6. | Karydas Panagiotis – Marine Surveyor | $ 37,212.00 |
| 7. | Karydas Panagiotis – airfares | $  8,157.14 |
| 8. | FSI Russian Maritime Register of Shipping | $  1,836.00 |
| 9. | Bank Guarantee Charges ($18,720.45 paid; $30,000.00 anticipated) | $ 48,720.45 |
| 10. | Detention of the vessel from January 25 at 0800 hours to March 12 at 1100 hours (46,125 days @ $15,000 per day) | $691,875.00 |
| | Sub Total | $935,322.42 |

20.  Saigon Petro, the owner of the terminal involved in the casualty has claimed $244,404.00 for damage to Jetty B, $3,684.11 for survey expenses, $3,406,364.76 for loss of use of Jetty B, and $40,467.16 for oil spill response expenses. A court in Ho Chi Minh City recently entered a judgment in favor of Saigon Petro against Starfish in the amount of $2,540,629.91 relating to these claims. Petroval is responsible to reimburse Starfish for payment of this judgment, plus interest and the costs and legal fees involved in the defense of the court action.

21. Ho Hi Minh City People's Committee has asserted the following claims against Starfish:

| | |
|---|---|
| (i)  Short term damage to natural resources | $  42,500.00 |
| (ii) Long term damage to natural resources | $621,800.00 |
| (iii) Oil Spill response | $   6,004.00 |
| (iv) Survey and investigation expenses, and managing oil spill response/salvage | $108,400.00 |
| | $778,704.00 |

Petroval is responsible to reimburse Starfish for any amounts Starfish is required to pay to the Ho Chi Minh City People's Committee relating to these claims.

22. The underwriters of the owner of the cargo which was lost as a result of the casualty have asserted a claim for loss of gasoil in the amount of $184,102.00. Petroval is responsible to reimburse Starfish for any amount it is required to pay to the owner or underwriter of the cargo which was lost.

23. The charter party provides that it is to be governed by English law and all disputes between the parties are to be resolved by arbitration in London.  Plaintiff Starfish commenced London Arbitration proceedings against Petroval on 23rd February 2006 and specifically reserves its right to arbitrate the substantive matters at issue in said arbitration.

24. This action is brought to obtain security in favor of Plaintiff Starfish for its claims against Petroval in aid of London arbitration proceedings and to obtain jurisdiction over Petroval for enforcement purposes.

25. This action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated attorney fees and costs in the arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

26. Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiff's claim.

27. Plaintiff Starfish's anticipated recoverable attorney fees and costs in the arbitration are estimated to be $400,000.00.

28. Plaintiff Starfish's interest recovery in the London Arbitration is estimated at $1,420,402.60 based on a rate of 8% p.a. for a period of 4 years.

29. Upon information and belief, and after investigation, Defendant Petroval cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising of, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (hereinafter, "ASSETS"), moving through banking institutions and/or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein, with the total amount to be attached being $6,259,160.93, based on the following:

| | |
|---|---|
| Starfish damages (Par. 19) | $ 935,322.42 |
| Saigon Petro judgment (Par. 20) | $2,540,629.91 |
| Ho Chi Minh City People's Committee Claim (Par. 21) | $ 778,704.00 |
| Cargo claim (Par. 22) | $ 184,102.00 |
| London arbitration attorney fees and costs (Par. 27) | $ 400,000.00 |
| Interest (Par. 28) | $1,420,402.60 |
| Total | $6,259,160.93 |

WHEREFORE, Plaintiff Starfish prays:

a.  That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged;

b.  That since Defendant cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendant, up to and including the sum of $6,259,160.93 be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, debts, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant Petroval (as identified herein) moving through or within the banking institutions and/or any other institutions or any garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c.  That this Court enter an order directing and compelling the defendant to appear and defend in the arbitration;

d.  That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary, including enforcement of the award and entry of judgment thereon; and,

e.  For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
November 5, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff

By: _____
Peter J. Gutowski (PG 2200)
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

### ATTORNEY VERIFICATION

State of New York    )
                  ) ss.:
County of New York  )

       PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

      1.    I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

      2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client through their English solicitors.

      3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

                                           Peter J. Gutowski

Sworn to before me this
___ day of November, 2007

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

Ex. A

From: "Alessandro Deprati" <a.deprati@nolarma.it>
To: "IMS" <IMSSAGR@otenet.gr>
Subject: M/T KASCO - CLEAN RECAP
Date: Tue, 21 Dec 2004 14:02:35 +0100

COSTAS /ALESSANDRO

GLAD TO RECAP HEREBELOW TERMS AGREED IN TODAY CLEAN FIXTURE:

C/P DATE        : 21.12.2004

CHARTERERS      : MESSRS PETROVAL
OWNERS          : MESSRS PLEASE ADVISE

VESSEL          : M/T KASKO Q88 ATTACHED

LAST CARGO      : VEGOIL
BEFORE          : VEGOIL
BEFORE          : VEGOIL

ITINERARY       : ETS QINHUANDAO AROUND 29/31 DEC 04

FOR:

CARGO           : UP TO FULL CARGO GASOIL
                  1/2 GRADES WVNS
                  OWNERS ADVISE VESSEL CAN LOAD ABOUT 30.000 TS OF GASOIL
                  BASIS MIN SG 0.835 AT LDD TEMP AND BASIS MAX 11,50 MTRS
BWSDLP
LOADING         : 1SP NAKHODKA
DISCHARGE       : 1 SP HONG KONG OR CHOPT
                  1 SP VIETNAM OR CHOPT
                  1/2 SP SINGAPORE OR CHOPT
                  1SP HAIPHONG AND 1SP HO CHI MINH CITY OR CHOPT
                  1SP HO CHI MINH CITY AND 1SP HAIPHONG OR CHOPT
                  1SP SUBIC BAY AND 1SP HAIPHONG OR CHOPT
                  1SP SUBIC BAY AND 1SP HO CHI MINH CITY OR CHOPT
                  1SP TAIWAN AND 1SP HAIPHONG OR CHOPT
                  1SP TAIWAN AND 1SP HO CHI MINH CITY
                  ALWAYS EXCL RIVER PORTS
                  CHOPT DISCHARGE AT STS
FREIGHT         : USD.345.000.- LPSM BSS 1/1 DISCH HONG KONG
                  USD.350.000.- LPSM BSS 1/1 DISCH VIETNAM OR SPORE
                  USD.400.000.- LPSM BSS 1/2 DISCH HAIPHONG AND HO CHI MINH
CITY
                  USD.445.000.- LPSM BSS 1/2 DISCH HO CHI MINH CITY AND
HAIPHONG
                  USD.445.000.- LPSM BSS 1/2 DISCH SUBIC BAY AND HAIPHONG
                  USD.375.000.- LPSM BSS 1/2 DISCH SUBIC BAY AND HO CHI
MONH CITY
                  USD.400.000.- LPSM BSS 1/2 DISCH TAIWAN AND 1SP HAIPHONG
                  USD.365.000.- LPSM BSS 1/2 DISCH TAIWAN AND 1SP HO CHI
MINH CITY
                  PORT EXPENSES FOR SECOND DISCHARGE PORT TO BE FOR
CHARTERERS ACCOUNT
                  AND TO BE SETTLED DIRECTLY BY THEM
LAY/CAN         : 8/14 JANUARY 2004 TO BE NARROWED BY OWNERS TO 3 DAYS
SPREAD
                  LATEST BY 16:00 HRS LONDON TIME ON THURSDAY 30.12.2004
DEMURRAGE       : USD 13.500 -PDPR
LAYTIME         : 84 HRS SHINC
CHARTER PARTY:  BEEPEEVOY3 PLUS PETROVAL TERMS AS AMENDED BELOW
                  TAX A/O DUES ASSESSED ON CARGO/FREIGHT TO BE FOR
CHARTERERS ACCOUNT
                  AND TO BE SETTLED DIRECTLY BY THEM

- AMENDMENTS TO BPVOY 3 + PETROVAL STANDARD CHARTERING TERMS ASF

                                                    Message Continues...

-CHARTS TO ADV PURPOSE THAT 5 PERSONS WILL BOARD THE VSL  AND THEY ARE
TO SIGN RELEAVE OF ANY LIABILITY TO OWNERS   (PLSE STATE IF OWNS / MASTER
SHLD PROVIDE FOOD) - DELETE N/A

MAIN BODY C/P BPV3

-LINE 9 DELETE 'BP SHIPPING LTD'

-LINE 42 INSERT ' ABT 12.0 KNOTS WSNP'

-LINES 51-63 DELETE

-LINE 66 AFTER 'AS ORDERED BY CHARTERERS' INSERT 'ALWAYS REACHABLE ON
VSL'S ARRIVAL'

-LINE 116 FM 'IF CHARTERERS ORDER..' TO LINE 142 DELETE

-LINE 146 INSERT 'TO OWNER'S DESIGNATED BANK ACCOUNT BY T/TRANSFER'

-LINES 149-154 DELETE

- LINE 157 BEFORE "PUMPS" INSERT "FIXED"

- LINE 158 DELETE "DEDUCT" INSERT "CLAIM"

- LINE 159 DELETE "TOGETHER....THERETO."

- LINE 161 DELETE "DEDUCTION FROM FREIGHT" INSERT "CLAIM"

- LINE 163 DELETE "DEDUCTION FROM FREIGHT" INSERT "CLAIM"

-LINES 178-201 DELETE - N/A

-LINES 202-203 DELETE AND INSERT 'ANY TAXES AND/OR DUES ON CARGO  AND/OR
FREIGHT IF ANY, TO BE FOR CHARTERER'S ACCOUNT AND TO BE  SETTLED
DIRECTLY BY THEM'

-LINES 207-209 DELETE

-LINE 220 AFTER  'A MINIMUM' INSERT 'PROVIDED RECEIVING  FACILITIES
PERMITS

-LINE 221 AFTER 'DISCHARGE' INSERT 'EXCLUDING STRIPPING PERIOD'

-LINE 223 AFTER 'MANIFOLD' INSERT 'IF SHORE RECEIVING FACILITIES ABANDON
THE RIGHT TO GAUGE DISCHARGE PRESSURE AT SHIP'S MANIFOLD,  THEN SHIP'S
PRESSURE REPORT SHALL BE BINDING ON OWNERS AND  CHARTERERS'

-LINES 224-225 DELETE FM 'OR 30...MAY BE'

-LINE 226 AFTER  'A MINIMUM' INSERT 'PROVIDED RECEIVING  FACILITIES
PERMITS'

-LINE 226 AFTER 'DISCHARGE' INSERT 'EXCLUDING STRIPPING PERIOD'

-LINE 242 AFTER 'TERMINAL' INSERT 'DELIVERED TO THE VESSEL AND/OR AGENTS
AND/OR OWNERS'

-LINE 256 DELETE '96 HOURS' INSERT '48 HRS'

-LINES 264-266 DELETE 'TOGETHER...LAYDAYS,'

-LINES 269-270 DELETE 'UNLESS...OR DISCHARGE'

-LINES 313-315 ADD 'WAITING ORDER DELAY TO BE PAID BY CHRTS AT DEMURRAGE
PRICE PLUS COST OF BUNKERS CONSUMED''

-LINES 319-320 DELETE 'COUNT...AS DEMURRAGE' INSERT 'BE PAID  TOGETHER

                                                   Message Continues...

WITH FREIGHT AT DEMURRAGE RATE AGAINST OWNER'S TLX INVOICE,  SUPPORTING DOCUMENTS TO FOLLOW'

-LINE 320 AFTER 'PAY' INSERT 'TOGETHER WITH FREIGHT'

-LINE 321 DELETE 'REPLACEMENT PRICE' INSERT 'COST'

-LINES 339-349 (SAMPLING) DELETE SEE ADDITIONAL CLAUSE AS BELOW

-LINES 362-366 DELETE

-LINES 409-433 DELETE

-LINES 434-446 DELETE

-LINE 461 INSERT 'CHARTERERS TO PROVIDE OWNERS WITH A L.O.I AS  PER OWNERS PANDY CLUB WORDING FOR NON PRODUCTION OF ORIGINAL B/L  AND/OR FOR CHANGE OF DESTINATION.SUCH LOI TO BE SIGNED BY CHARTERERS,  NO BANK GUARANTEE. SUCH LOI TO BE CONSIDERED NULL AND  VOID UPON PRESENTATION TO OWNERS OF ORIGINAL B/L'S DULY ENDORSED BY  RECEIVERS FOR RECEIPT OF CARGO AND MARKED VOYAGE DULY ACCOMPLISED OR  13 MONTHS AFTER COMPLETION OF DISCHARGE PROVIDED NO LEGAL PROCEEDINGS HAVE BEEN INSTITUTED BY ANY PARTY AGAINST OWNERS'

-LINES 462-476 DELETE

-LINES 478-486 DELETE N/A

-LINES 490-491 DELETE AND INSERT 'CHARTERERS AGENTS BOTH ENDS PROVIDED COMPETITIVE EXCEPT FOR SECOND DISCHARGE PORT WHERE CHARTERERS AGENTS TO APPLY

-LINE 496 DELETE 'BP SHIPPING LONDON'

-LINES 520 INSERT AT THE END "PETROVAL SA ALWAYS TO FULLFILL ALL CHARTER PARTY OBLIGATIONS AND TO ADVISE OWNERS IN WRITING ABOUT NAME OF SUB CHARTERERS AS SOON AS POSSIBLE"

-LINE 522 DELETE 'OWNERS' INSERT 'CHARTERERS'

-LINES 522-523 DELETE FM 'AND CHARTERERS...THE FREIGHT' INSERT  'AND TO BE SETTLED DIRECTLY BY THEM'

-LINES 524-526 DELETE

-LINES 560-611 ADD 'ANY EXTRA WAR RISK INSURANCE IMPOSED BY HULL UNDERWITTERS INCL B/T AND CWB SHALL BE PAID BY CHARTS AGINST OWNERS INVOICE ACCORDING TO LONDON SCALE'

 ALSO ADD 'VSSLS H AND M VALUE IS USD 3.0 MIO'

-LINES 647-654 DELETE N/A

-LINES 683-716 DELETE

-LINES 717-729 DELETE

PETROVAL's AMENDMENTS TO BPVOY3

-CLS  4 - OK
-CLS 19 - OK
-CLS 34 - OK
-CLS 35 - OK
-CLS 36 - DELETE SEE  ABV
-CLS 40 - OK
-CLS 43 - OK
-CLS 49 - OK
-CLS 52 - OK

                                        Message Continues...

-CLS 53 - OK
-CLS 55 - OK


PETROVAL's ADDITIONAL TERMS

CLS 56 - OK
CLS 57 - INSERT AT THE END VSL IS SBT
CLS 58 - OK
CLS 59 - DELETE '0.3' INSERT '0.5' ALSO DELETE 'DEDUCT' INSERT 'CLAIM'
CLS 60 - PART II INSERT 'WEST OF ENGLAND'
CLS 62 - OK
CLS 63 - OK
CLS 64 - OK
CLS 65 - (ADMINISTRATION CL) OKAY BUT AFTER 'TELEX' INSERT  ' A/O
E-MAILS A/O FAXES'

CLS 66 - (COMMISSIONS)

OWNS ADDITIONAL TERMS

1.-CARGO SAMPLING CLAUSE
CHARTERERS TO HAVE THE OPTION FOR VESSEL TO CALL AT A PORT OR PLACE ON
OR OFF ROUTE FROM LOADING PORT(S) TO DISCHARGE PORT(S) FOR SAMPLING
PURPOSES.

ALL COSTS IN THIS CONNECTION (INCLUDING BUT NOT LIMITED TO PORT COSTS
AND BUNKERS CONSUMED -INCLUDING HEATING- AT COST) TO BE FOR
CHARTERERS'ACCOUNT.  ALL TIME LOST FOR ANY DEVIATION AND SUCH OPERATION
TO COUNT AT FULL DEMMURAGE RATE PD/PR.  ALL SUCH COSTS TO BE PAID
TOGETHER WITH FREIGHT AGAINST OWNER'S TELEX INVOICE AS PER MASTERS
STATEMENT'.

2.-CONOCO WEATHER CLS

CONOCO WEATHER CLS TO APPLY EXCEPT IF FUMICINO/FALCONARA /
RAVENNA/LNOUVELLE /SPB/SETE/SYRIA/LEBANON AND IF LOAD DISCHARGE VIA
SEALINE/SEABUOY/ OPEN SEABERTH/SEA PLATFORM/SBM/LIGHTERAGE/
LIGHTERING/STS TRANSFER AND PORT KAVKASS WHERE TIME TO COUNT IN FULL,
AGAINST LAYTIME OR DEMURRAGE IF VSL ON DEMURRAGE, WEATHER PERMITTTING OR
NOT. ANY UNBERTHING/REBERTHING TIME/EXPENSES DUE TO BAD WEATHER AND/OR
SEA CONDITIONS TO BE FOR CHARTERER'S ACCOUNT AND TO BE SETTLED DIRECTLY
BY THEM'

-EXXON EARLY LOADING CLS:
  IN THE EVENT CHRTS AGREES TO LOAD VESSL PRIOR TO COMMENCEMENT OF
LAYDAYS ALL SUCH TIME TO BE CREDITED AGAINST ANY TIME VESSEL IS ON
DEMURRAGE.FOR THE PURPOSE OF THIS CLS, TIME TO COUNT WHEN VESSL IS ALL
FAST AT THE LOAD PORT.

  - PETROVAL REVISED BIMCO ISPS CLAUSE
  ------------------------------------
(A) (i) From the date of coming into force of the International Code for
the Security of Ships and of Port Facilities and the relevant amendments
to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel, the Owners
shall procure that both the Vessel and "the Company" (as defined by the
ISPS Code) shall comply with the requirements of the ISPS Code relating
to the Vessel and "the Company". Upon request the Owners shall provide a
copy of the relevant International Ship Security Certificate (or the
Interim International Ship Security Certificate) to the Charterers. The
Owners shall provide the Charterers with the full style contact details
of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage,
expense or delay, excluding consequential loss, caused by failure on the
part of the Owners or "the Company" to comply with the requirements of
the ISPS Code or this Clause shall be for the Owners' account.

Message Continues...

(B) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and any other information the Owners require to comply with the ISPS Code.

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for Charterers' account and any delay caused by such failure shall be compensated at the demurrage rate.

(C) Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code, and that the measures imposed by the port facility of relevant authorities applies to all vessels in that port and not solely to the Owner's Vessel, the following shall apply:

(i) Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code.

(ii) Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code shall count as half-laytime or half-time on demurrage if the Vessel is on laytime or demurrage. If the delay occurs before laytime has started or after laytime or time on demurrage has ceased to count, it shall be compensated by the Charterers at one half the demurrage rate and always in accordance with A(ii).

(D) Notwithstanding anything to the contrary provided in this Charter Party, any additional costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections,                    unless such costs or expenses result solely from the Owners' negligence, shall be shared equally between Owner and Charterers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(E) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

1,25 PCT ADD COMM PLUS 1,25 PCT TO NOLARMA ON ALL MONEY EARNED

END

BEST REGARDS
ALESSANDRO

NOLARMA TANKERS S.R.L.
PIAZZA DELLA VITTORIA, 7/4
PHN  : 0039 010 5398212 (DIRECT LINE)
FAX  : 0039 010 5958022
MOB  : 0039 335 1331360
AOH  : 0039 019 993399
EMAIL: a.deprati@nolarma.it
YAHOO: alex_deprati

[A Mime Part (Q88 - KASCO.doc - attachment;
       filename="Q88 - KASCO.doc") was detected here]

Received: from serverposta.nolarma.local ([213.156.55.127])

Message Continues...

**BP SHIPPING LTD.**
Britannic House
Moor Lane
LONDON EC2Y 9BU



Code word for this Charterparty
"BEEPEEVOY 3"

# *Voyage Charterparty*

LONDON..........................................................................19.............    1

*It is this day agreed between*..........................................................    2

of..................................................................................................    3

................................................................................................    4

Owners (hereinafter referred to as 'Owners') of the good motor/steam tank vessel called    5

................................................................................................    6

(hereinafter referred to as 'the Vessel') now.....................................    7

..............................................and expected ready to load about ............    8

and *BP Shipping Limited*  of London as agents for................................    9

................................................................................................    10

(hereinafter referred to as 'Charterers')    11

**Classification** 1.    ......... undertake that:    12

(a) the Vessel is classed.... .........................................................    13

**Description of Vessel**
(b) the Vessel has a summer deadweight of.......................................................tonnes    14

on a saltwater draught of........................................ ...................metres, with a total cargo capacity (98%    15
full) of..........................................cubic ... tres;    16

(c) the Vessel is fully fitted with heating coils fabricated from..........................................    17
in all cargo tanks, capable of heating the cargo to, and ma..ntaining it at all times at a temperature of,    18
57deg C (135deg F);    19

(d) the Vessel is equipped with derricks capable of lifting to, and supporting at, the Vessel's port and    20
starboard manifolds submarine hoses of up to.....................tonnes in weight.    21

**Condition of Vessel**
2.    Owners shall before, at the commencement of, and throughout the voyage exercise due diligence to    22
make and maintain the Vessel, her tanks, pumps, valves and pipelines tight, staunch, strong, in good order    23
and condition, in every way fit for the voyage and fit to carry the cargo provided for in Clause 3, with the    24
Vessel's machinery, boilers and hull in a fully efficient state, and with a full and efficient complement of    25
Master, officers and crew.    26

**Loading
and Discharge
Ports Range**

3.    Subject to the provisions of Clause 24, the Vessel shall proceed to ............................................    27

.................................................................................................................................................................    28

.................................................................................................................................................................    29

.................................................................................................................................................................    30

**Cargo**

or so near thereunto as she may safely reach, and there load a cargo of.................................................    31

.................................................................................................................................................................    32

.................................................................................................................................................................    33

.................................................................................................................................................................    34

.................................................................................................................................................................    35

.................................................................................................................................................................    36

...................................................................................................................................................in bulk,    37
not exceeding what she can reasonably stow and carry over and above the tackle, provisions and furniture,    38
and in any case not in excess of the quantity permitted by the International Load Line Convention, 1966, or    39
any modification or amendment thereof as may be applicable to the voyage to be performed under this    40
Charter. Thereupon the Vessel shall proceed with such cargo at a speed which Owners undertake shall be    41
..............................................knots ('Base Speed'), as ordered on signing Bills of Lading or as provided in Clauses    42

24 and/or 26 to...............................................................................................................................................    43

.................................................................................................................................................................    44

.................................................................................................................................................................    45

.................................................................................................................................................................    46

.................................................................................................................................................................    47

.................................................................................................................................................................    48

..........................................................................or so near thereunto as she may safely reach,    49
and deliver the same in consideration of the payment of freight as provided in Clauses 6 and 7.    50

Charterers shall have the right at any time during the voyage to order the Vessel to increase speed in order    51
to arrive at a port or place on a certain date. Charterers shall not instruct the Vessel to increase speed such    52
as to require the Vessel to proceed at a maximum speed in excess of that set out in the BP Shipping    53
Questionnaire. If Charterers require any increase of speed to be made, any increase in the freight rate    54
consequent thereon shall be calculated in accordance with the provisions of Clause 6.    55

If the Vessel fails to maintain Base Speed, or fails to comply with instructions as to the increase of speed    56
given by Charterers pursuant to this Clause, Owners shall, subject to Clause 46, be liable for all costs,    57
losses, damages and expenses arising as a direct consequence thereof save to the extent that Owners can    58
prove to the satisfaction of Charterers that such failure was attributable to a reduction in speed necessi-    59
tated by either adverse weather and sea state conditions or the safe navigation of the Vessel and Charterers    60
shall be entitled to deduct any such costs, losses, damages and expenses from any demurrage due to Owners    61
hereunder without prejudice to any other rights available to Charterers under this Charter or otherwise    62
under English Law.    63

**Loading/
Discharge
Place**

4.    The Vessel shall be loaded and discharged at any port, berth, dock, anchorage, submarine line,    64
single point or single berth mooring facility, offshore location, alongside vessels or lighters, or any other    65
place whatsoever as ordered by Charterers. Charterers shall exercise due diligence before directing the    66
Vessel to any such places to ascertain that the Vessel can always lie safely afloat, but Charterers do not    67
warrant the safety of any of the aforementioned places and shall be under no liability in respect thereof    68
except for loss or damage caused by the failure to exercise due diligence as aforesaid.    69

3

If a port is nominated which cannot accommodate the Vessel with the quantity of cargo carried, Charterers undertake to discharge sufficient cargo at a previous port or place, or into vessels or lighters, to enable the Vessel to enter and lie at such nominated port or place. Freight shall be paid in accordance with Clause 6 and lighterage shall be at the expense of Charterers. [70] [71] [72] [73]

A place of lightening at sea shall not constitute a discharge port or place under Clause 19, but all time used for a lightening operation (excluding any time lost or spent by reason of any of the causes stipulated in Clauses 20 and 21) shall count against the number of running hours stipulated in Clause 18 for the purpose of calculating Charterers' liability, if any, for demurrage as provided in Clause 22. For the purpose of this Clause the lightening operation shall be deemed to commence when the Vessel is properly tied up and moored alongside the lightening vessel and to end when unmooring has been completed. [74] [75] [76] [77] [78] [79]

Subject to the preceding paragraph of this Clause, any additional steaming and/or waiting time used solely by reason of Charterers' orders to lighten at sea shall count as laytime or, if the Vessel is on demurrage, as demurrage. [80] [81] [82]

**Ship to Ship Transfer Operations**

If Charterers require the Vessel to trans-ship cargo from or into another ocean-going vessel the trans-shipment operation shall be carried out in accordance with the recommendations set out in the latest edition of the ICS/OCIMF Ship to Ship Transfer Guide (Petroleum) and Owners undertake that the Vessel and her crew will comply with such recommendations. Charterers shall provide and pay for all necessary equipment including suitable fenders and hoses. Owners shall permit supervisory personnel nominated by Charterers to attend on board, including a Mooring Master, to assist in the trans-shipment operation. In the case of a ship to ship transfer freight shall be paid in accordance with the provisions of Clause 6. [83] [84] [85] [86] [87] [88] [89]

No provision herein contained as to laytime and demurrage shall be affected by the provisions of Clause 46. [90]

**Shifting**

5. Charterers may require the Vessel to load at more than one berth at each loading port or place and to discharge at more than one berth at each discharge port or place in which event Owners shall, in the first instance, pay expenses arising from any of the following movements of the Vessel:- [91] [92] [93]

(a) unmooring at, and pilotage and towage off, the first loading or discharge berth; [94]

(b) mooring and unmooring at, and pilotage and towage on to and off, the intermediate loading or discharge berths; and [95] [96]

(c) mooring at, and pilotage and towage on to, the last loading or discharge berth. [97]

Charterers shall reimburse Owners in respect of expenses properly incurred arising from any of the aforementioned movements upon presentation by Owners of all supporting invoices evidencing prior payment by Owners. [98] [99] [100]

Charterers shall reimburse Owners in respect of any dues and/or other charges incurred in excess of those which would have been incurred if all the cargo involved at the particular port or place had been loaded or discharged at the first berth only. Time consumed on account of shifting shall count as laytime or, if the Vessel is on demurrage, as demurrage, except as otherwise provided in Clause 20. [101] [102] [103] [104]

**Port and Terminal Combinations**

For the purpose of freight payment, the places grouped in Port and Terminal Combinations in the New Worldwide Tanker Nominal Freight Scale (hereinafter referred to as 'New Worldscale'), as amended at the date of this Charter, shall be considered as berths within a single port, Charterers reimbursing shifting expenses in accordance with the foregoing provisions. [105] [106] [107] [108]

**Rate of Freight**

6. The rate of Freight shall be at the level of.................................................................... [109]

.............................................................................................................................. [110]

.............................................................................................................................. [111]

.............................................................................................................................. [112]

.............................................................................................................................. [113]

.............................................................................................................................. [114]

............................................................................% of the rate for the voyage [115]
as provided in New Worldscale, as amended at the date of this Charter. If Charterers order the Vessel to [116]

increase speed under the provisions of Clause 3 such rate shall be increased by.................... New
Worldscale points for each knot of increased speed above the Base Speed or on a pro rata basis for fractions
of a knot up to a maximum of..........................................knots. Such increase shall be calculated in accordance
with the following example:

    Example: The Vessel proceeds at Base Speed of 10 knots, the rate for which is New Worldscale 40.
    After 10 days the Vessel is ordered to complete the voyage at 12 knots. The remainder of the
    voyage takes 20 days. The increased speed option provides for a premium of 0.5 of a New Worldscale
    point per knot of increased speed over Base Speed.

    The freight rate for the above voyage would be calculated as follows:
    Voyage Freight Rate = (NW40 x 10 days) + (NW41* x 20 days)
                      30 (total voyage days)

              = NW40.67

    (*1 point premium for 12 knots maximum speed)

Should the Vessel not maintain the speed ordered, due to breakdown or any other reason whatsoever
beyond Charterers' control, the freight rate shall be calculated based on the average speed actually
achieved by the Vessel using BP Worldwide Marine Distance Tables to assess the length of the voyage
between pilot stations at the loading and discharge ports or places.

If the Vessel is ordered to lighten pursuant to Clause 4, the freight rate shall, notwithstanding the
lightening, be the same New Worldscale rate for the voyage as would be payable if no such lightening had
taken place.

In the case of a ship to ship transfer, as referred to in Clause 4, the freight rate for the voyage shall be the
rate as provided in New Worldscale for the relevant Trans-shipment Area, as amended at the date of this
Charter, or as provided by New Worldscale upon application by the parties or either of them.

Notwithstanding the provisions of Clause 3 and the provisions of this Clause should the Vessel load in
excess of the quantity specified therein then the freight payable for any overage in excess of such quantity
shall be at one half of the freight rate(s) referred to above.

**Payment of Freight**    7.    Freight shall be payable immediately after completion of discharge, on the gross quantity of cargo
loaded by the Vessel as evidenced by the Bills of Lading furnished by the shippers. Payment shall be made
in U.S. dollars

to.......................................................................................................................................

..............................................................................................................................................

..............................................................................................................................................less

any sum derived from the operation of Clauses 8 and 54 and less any disbursements or advances made to
the Master or agents at ports of loading and/or discharge, and additional cargo insurance premium for
Owners' account under Clause 42, provided that no freight shall be payable on any quantity which
submerges, at any stage of the voyage, the marks appropriate under the International Load Line
Convention, 1966, or any modification or amendment thereof as may be applicable to the voyage to be
performed under this Charter.

**Cargo Retention**    8.    If any material remains in the Vessel's cargo tanks on completion of discharge of cargo Charterers
shall be entitled to appoint an independent surveyor to determine what, if any, quantity of such material is
cargo which is liquid, pumpable and reachable by the Vessel's pumps. The independent surveyor's findings
shall be final and binding on Owners and Charterers. Charterers shall be entitled to deduct from freight an
amount equal to the FOB port of loading value of any quantity so determined together with freight due with
respect thereto. Charterers hereby agree to indemnify Owners against any liability to a Bill of Lading
holder resulting from non-delivery of any such cargo in respect of which a deduction from freight is made
provided, however, that Charterers shall in no event be liable to indemnify Owners in an amount greater
than the amount of the deduction from freight.

**Cleaning of Vessel's Tanks, Pumps and Pipelines**    9.    Without prejudice to the provisions of Clause 2 Owners shall use due diligence to ensure that the
Vessel presents for loading with her tanks, pumps and pipelines properly cleaned to the satisfaction of any
inspector appointed by Charterers and ready for loading the cargo specified in Clause 3. Any time used in
cleaning tanks, pumps and pipelines to Charterers' Inspector's satisfaction shall not count as laytime or
demurrage and shall, together with any costs incurred in the foregoing operations, be for Owners' account.

5

| | | |
|---|---|---|

**Arriving to Even Keel**    10.  If for any reason the Vessel is unable to trim to even keel for arrival at a discharge port Owners shall notify Charterers by radio or telex stating the Vessel's expected arrival draught forward and aft in salt water. Such notification shall be given as soon as practicable after the receipt of loading orders and no later than sailing from the loading port or place.    `170 171 172 173`

**Slack Tanks**    11.  Notwithstanding the provisions of Clause 7, if Charterers are unable to supply the quantity of cargo specified in Clause 3 the Vessel shall not be required to proceed to sea until such of her tanks are filled as will place her in a seaworthy condition, and freight shall be paid as if the Vessel had been loaded with the quantity of cargo specified in Clause 3.    `174 175 176 177`

**Inert Gas System**    12.  Owners undertake that the Vessel is equipped with a fully functional Inert Gas System which is in use on the date hereof and shall so remain during the period of this Charter and that the officers and crew are properly qualified by way of certification for, and experienced in, the operation of such System. Owners further undertake that the Vessel shall arrive at the loading port with her cargo tanks inerted and that such tanks shall remain inerted throughout the voyage and the subsequent discharge of the cargo. Any time lost, whether or not the Vessel is on demurrage, owing to deficient or improper operation of the Inert Gas System shall be for Owners' account.    `178 179 180 181 182 183 184`

The Vessel's Inert Gas System shall fully comply with Regulation 62, Chapter II-2 of the SOLAS Convention 1974 as modified by its Protocol of 1978 and Owners undertake that such System shall be operated by the officers and crew in accordance with the operational procedures set out in the IMO publication entitled 'Inert Gas Systems 1983' as may, from time to time, be amended.    `185 186 187 188`

If Charterers so require, Owners shall arrange for the Vessel's tanks to be de-inerted to facilitate inspection, gauging and sampling. Any time taken in de-inerting, inspecting, gauging, sampling and re-inerting thereafter shall count as laytime or, if the Vessel is on demurrage, as demurrage.    `189 190 191`

**Crude Oil Washing**    13.  Owners undertake that the Vessel is equipped with a fully functional Crude Oil Washing System and that the officers and crew are properly qualified by way of certification for, and experienced in, the operation of such System.    `192 193 194`

The Master shall arrange for the crude oil washing of cargo tanks at the discharge port or place to the MARPOL minimum standards as set out in the Vessel's Crude Oil Washing Operation and Equipment Manual or in accordance with Charterers' requirements. A period of 6 hours for a full cargo, or pro rata thereof in respect of a part cargo, in addition to the period specified in Clause 16 shall be allowed for crude oil washing and any additional time taken therefor shall not count as laytime or, if the Vessel is on demurrage, as demurrage.    `195 196 197 198 199 200`

**Dues and Other Charges**    14.  Dues and other charges levied upon the Vessel, howsoever assessed, shall be paid by Owners. Dues and other charges upon the cargo shall be paid by Charterers.    `201 202`

Notwithstanding the foregoing where, under the provisions of New Worldscale, as amended at the date of this Charter, a due or charge is expressly for the account of Owners or Charterers then such due or charge shall be paid in accordance with such provisions.    `203 204 205`

Should a charge be imposed upon Charterers by the owner of a berth by reason of prolonged occupation of such berth by the Vessel for reasons beyond the control of Charterers or their agents such charge shall be paid by Owners.    `206 207 208`

**Loading and Discharge of Cargo**    15.  The cargo shall be pumped into the Vessel at the expense of and at the risk and peril of Charterers as far as the Vessel's manifold only, and pumped out of the Vessel at the expense of and at the risk and peril of Owners as far as the Vessel's manifold only.    `209 210 211`

Owners shall, if requested, make available the hands, equipment, and facilities required on board for the connecting and disconnecting of hoses for loading and discharging. The Master may demand shore supervision of, and approval for, the connecting and disconnecting of hoses. Any delay resulting from the failure by Owners to provide the hands, equipment and facilities as aforesaid shall not count as laytime or, if the Vessel is on demurrage, as demurrage.    `212 213 214 215 216`

**Pumping**    16.  Owners undertake that the Vessel shall discharge a full cargo, as defined hereunder, within 24 hours, or pro rata thereof in respect of a part cargo, from the commencement of pumping or that the Vessel shall maintain a minimum discharge pressure of 100 psig at the Vessel's manifold throughout the period of discharge provided that the shore receiving facilities are capable of accepting discharge of the cargo within such time or at such pressure. If crude oil washing is requested by Charterers the applicable period for discharge shall be increased by a period of up to 6 hours in accordance with Clause 13. The shore receiving facilities shall have the right to gauge discharge pressure at the Vessel's manifold.    `217 218 219 220 221 222 223`

6

Any additional time used owing to the inability of the Vessel to discharge the cargo within 24 hours or 30     224
hours, as the case may be, or such shorter period as may be applicable in the case of a part cargo, or to        225
maintain a minimum discharge pressure of 100 psig at the Vessel's manifold throughout the discharge shall        226
be for Owners' account and shall not count as laytime or, if the Vessel is on demurrage, as demurrage. If        227
the shore receiving terminal facilities are unable to accept discharge of the cargo within the aforemen-        228
tioned time or at the aforementioned discharge pressure the Master shall present the shore receiving             229
terminal with a Note of Protest forthwith, and in any event prior to the Vessel's departure from the berth,     230
and shall use all reasonable endeavours to have such Note of Protest countersigned on behalf of the shore       231
receiving terminal in the absence of which countersignature the Master shall present a further Note of           232
Protest to the shore receiving terminal.                                                                          233

For the purpose of this Clause a full cargo shall mean the quantity referred to in Clause 3 or the Bill of       234
Lading quantity, whichever is the greater.                                                                        235

Charterers will not consider any claim by Owners for additional time used in the foregoing circumstances         236
in the absence of the provision by Owners of the following documentation:-                                        237

(a) an hourly pumping log, signed by a responsible officer of the Vessel and a terminal or Charterers'           238
representative, showing the pressure maintained at the manifold throughout discharge and, in the absence         239
of a signature from a terminal or Charterers' representative, a Note of Protest;                                  240

(b) copies of all Notes of Protest issued or received by the Vessel in relation to the discharge in question; and  241

(c) copies of any other documentation generated by the Vessel or by the shore receiving terminal relevant        242
to the discharge in question.                                                                                     243

Laydays/          17.  Laydays for the purpose of this Charter shall be from ...............................................................     244
Cancelling
                  ("the Commencement Date") to..............................................................("the Cancelling     245
                  Date"). Laytime for the purposes of loading shall not commence before 0600 hours local time on the Com-     246
                  mencement Date unless with Charterers' sanction in which event laytime shall commence when the Vessel       247
                  commenced loading and should the Vessel not be ready to load by 1600 hours local time on the Cancelling     248
                  Date Charterers shall have the option of cancelling this Charter. Should the Vessel, with Charterers'       249
                  sanction, have commenced loading prior to the commencement of laytime, as provided above, then the time    250
                  from such commencement of loading to the commencement of laytime shall constitute additional laytime       251
                  for the purpose of loading and discharging and in respect of the period(s) referred to in Clause 18.       252

                  If it appears to Charterers that the Vessel will be delayed beyond the Cancelling Date Charterers may       253
                  require Owners to notify Charterers of the date on which they expect the Vessel to be ready to load         254
                  whereupon Charterers shall have the option to cancel this Charter and such option shall then be declared    255
                  by Charterers within 96 hours, Sundays and holidays excepted, of the receipt of the said notification from  256
                  Owners. In the event of Owners giving such notification and Charterers not exercising their option to       257
                  cancel within the stated period, the third day after the readiness date stated in Owners' notification, or  258
                  such other date as may be mutually agreed, shall be the new Cancelling Date for the purpose of this Clause. 259
                  If Owners fail to give such notification when requested by Charterers, Charterers shall have the option to  260
                  cancel this Charter at any time prior to the arrival of the Vessel.                                         261

                  Cancellation or failure to cancel shall be entirely without prejudice to any claim for damages Charterers  262
                  may have for the Vessel not being ready to load by the original Cancelling Date stated in this Clause.      263

Amount of, and    18.  Charterers shall be allowed.............................hours, together with any period of additional     264
Definition of,    laytime arising under the provisions of Clause 17 if Charterers sanction loading of the Vessel before the    265
Laytime           commencement of laydays, as laytime for loading and discharging and in respect of any period(s) when the     266
                  Vessel, in accordance with Charterers' instructions, is proceeding or operating as referred to in Clauses 4, 267
                  5, 12, 21, 24, 25, 26, 29, 30 and 31. Sundays and holidays shall be included in respect of laytime for loading 268
                  or discharging unless loading or discharging on the Sunday or holiday in question is prohibited by law or     269
                  regulation at the port or place of loading or discharge and Charterers shall have the right of loading and    270
                  discharging during the night.                                                                                271

                                                                                                                               272

Commencement      19.  Subject only to Clauses 17, 20 and 21:-                                                                 273
and Termination
of Laytime/       (a) laytime or, if the Vessel is on demurrage, demurrage shall at each loading and each discharge port or    274
Demurrage         place commence at the expiry of 6 hours after Notice of Readiness to load or discharge has been received     275
for Loading       from the Master or his agent by Charterers or their agents, berth or no berth, or when the Vessel           276
and Discharge     commences to load or discharge at the berth or other loading or discharging place, whichever first occurs.

Such Notice of Readiness may be given either by letter, facsimile transmission, telegram, telex, radio or telephone (and if given by radio or telephone shall subsequently be confirmed in writing and if given by facsimile transmission confirmed by telex) but Notice of Readiness shall not be given, without Charterers' sanction, before the commencement of laydays; and

(b) laytime or, if the Vessel is on demurrage, demurrage shall run until the cargo hoses have been finally disconnected upon termination of loading or discharging, such disconnection to be effected promptly; provided always that if the Vessel is detained for more than 2 hours beyond the final disconnection of hoses by the shore terminal solely for the completion of cargo documentation and the presentation of such documents on board the Vessel, laytime or, if the Vessel is on demurrage, demurrage shall re-commence after such period of 2 hours and terminate upon the completion of cargo documentation.

**Suspension of Laytime/ Demurrage for Loading and Discharge**

20.   Time shall not count against laytime or, if the Vessel is on demurrage, for demurrage when spent or lost:-

(a) on an inward passage, including awaiting daylight, tide, opening of locks, pilot, or tugs and moving from anchorage, even if lightening has taken place at the anchorage, until the Vessel is securely moored at the berth or other loading or discharging place specified by Charterers;

(b) due, whether directly or indirectly, to breakdown, inefficiency or other cause attributable to the Vessel and/or Owners, including inability of the Vessel to pump out the cargo at the rate indicated in Clause 16 after taking account of any variations in back pressure;

(c) as a result of a labour dispute, or strike, involving Master, officers or crew of the Vessel or tugs or pilot;

(d) in, or in connection with, the handling of ballast unless this is carried out concurrently with loading or discharging such that no loss of time is involved; and

(e) in cleaning tanks, pumps and pipelines.

Nothing herein contained shall be affected by the provisions of Clause 46.

**Laytime/ Demurrage/ Force Majeure**

21.   Any delay(s) arising from adverse weather or sea state conditions, fire, explosion, breakdown or failure of equipment, plant or machinery in or about ports or places of loading and/or discharge, Act of God, act of war, labour dispute, strike, riot, civil commotion, or arrest or restraint of princes, rulers or peoples shall, provided always that the cause of the delay(s) was not within the reasonable control of Charterers or Owners or their respective servants or agents, count as one half laytime or, if the Vessel is on demurrage, at one half of the demurrage rate.

**Demurrage**

22.   Charterers shall pay demurrage at the rate of US$................................per running day and pro rata for part of a running day for all time that loading and discharging and any other time counting as laytime exceeds the laytime specified in Clause 18.

**Demurrage Time Bar**

23.   Charterers shall be discharged and released from all liability in respect of any claim for demurrage which Owners may have under this Charter unless a claim in writing has been presented to Charterers together with supporting documentation substantiating each and every constituent part of the claim within 90 days of the completion of discharge of the cargo carried hereunder.

**Orders for Discharge Ports or Places**

24.   If, at any time after the Vessel has completed loading the cargo or part cargo, as the case may be, Charterers instruct the Vessel to await their orders at one or more locations, then all time spent by the Vessel awaiting orders as aforesaid shall count as laytime or, if the Vessel is on demurrage, as demurrage.

**Revised Orders**

If after any loading or discharge port or place has been nominated Charterers desire to vary such port or place, Owners shall issue such revised instructions as are necessary at any time to give effect to Charterers' revised orders and any period by which the steaming time taken to reach the alternative port or place exceeds the time which should have been taken had the Vessel proceeded thither directly shall count as laytime or, if the Vessel is on demurrage, as demurrage. Charterers shall pay Owners for additional bunkers consumed during such excess time at the replacement price as paid by Owners substantiated by copies of such documents as Charterers may require.

**Vessel/Cargo Inspections/ Bunker Surveys**

25.   Charterers shall be entitled to cause their representative(s) to carry out inspections of the Vessel and/or observe cargo operations and/or ascertain the quantity and quality of the cargo, water and residues on board at any loading and/or discharge port or place.

Charterers' representative(s), or any independent surveyor appointed by Charterers, shall be entitled to

277
278
279
280

281
282
283
284
285
286

287
288

289
290
291

292
293
294

295

296
297

298

299

300
301
302
303
304
305

306
307
308

309
310
311
312

313
314
315

316
317
318
319
320
321
322

323
324
325

326

survey and take samples from any or all of the Vessel's bunker fuel tanks and non-cargo spaces at any — 327
loading and/or discharge port or place. — 328

Any exercise of, or failure to exercise, any of their rights under the foregoing provisions by Charterers shall — 329
neither increase nor reduce the respective rights and obligations of the parties under this Charter and shall — 330
not be deemed to be, nor construed as, a waiver or acceptance of any default on the part of Owners. — 331

Any delay arising solely as a result of any such inspection, survey or sampling as aforesaid shall count as — 332
laytime or, if the Vessel is on demurrage, as demurrage. If the Master refuses to permit any such — 333
inspection, survey or sampling as aforesaid Charterers shall have the right to procure the removal of the — 334
Vessel from the place at which she is lying. All time lost by reason of any such refusal by the Master, — 335
including without limitation any time used in shifting the Vessel off, and back to, such, or any other, place — 336
shall not count as laytime or, if the Vessel is on demurrage, as demurrage and any expenses incurred as a — 337
result of any such refusal, including without limitation Vessel shifting expenses, shall be paid by Owners. — 338

Cargo Sampling    26.    Charterers shall be entitled to require the Vessel to deviate at any time after leaving any loading — 339
port or place and to call at or off a port or place for cargo sampling purposes. Charterers undertake to — 340
obtain the consent of the owner(s) of any cargo on board at the time before requiring the Vessel to deviate — 341
as aforesaid. — 342

Any delay arising from Charterers' requiring the Vessel to deviate as aforesaid, based upon the period by — 343
which the steaming time taken by the Vessel to reach the next port of loading or discharge exceeds the time — 344
which should have been taken had the Vessel proceeded thither directly, shall count as laytime, or if the — 345
Vessel is on demurrage, as demurrage. Charterers shall pay Owners for additional bunkers consumed — 346
during the period of deviation at the replacement price as paid by Owners and substantiated by copies of — 347
such documents as Charterers may require and shall pay port expenses incurred by Owners at the port to — 348
which Owners were required to divert the Vessel. — 349

Maintenance    27.    If Charterers so require Owners shall maintain the loaded temperature of the cargo and the Master — 350
of Cargo    shall advise Charterers, on a daily basis, of the temperature of such cargo in each of the Vessel's tanks. Not- — 351
Temperature    withstanding the foregoing the Vessel shall not be obliged to maintain the cargo at a temperature in excess — 352
of 57degC (135degF). Owners warrant that the Vessel is capable of maintaining the cargo up to such — 353
maximum temperature throughout the laden voyage and throughout discharge of the cargo. If the Vessel — 354
fails to maintain the required temperature Owners shall be responsible for any resulting delay and any — 355
time lost thereby shall not count as laytime or, if the Vessel is on demurrage, as demurrage. Should it — 356
become necessary for the Vessel to vacate the berth because of Owners' failure to maintain the required — 357
temperature all time lost and expenses incurred shall be for Owners' account. — 358

Cargo Heating    28.    Charterers shall be entitled to require the Vessel to raise the temperature of the cargo above the — 359
loaded temperature up to a maximum temperature of 57deg C (135deg F) in all the Vessel's tanks. The — 360
Master shall advise Charterers, on a daily basis, of the temperature of the cargo in each of the Vessel's — 361
tanks throughout the voyage. Charterers shall reimburse Owners for the cost of additional bunkers used — 362
solely to raise the temperature of the cargo as aforesaid, as evidenced by copies of the Vessel's daily Engine — 363
Log Book for the complete laden voyage, subject to a limit of 6 tonnes per degree Celsius. Charterers shall — 364
pay for such bunkers at the replacement price paid by Owners and substantiated by copies of such — 365
documents as Charterers may require. — 366

Ice on Voyage    29.    If on passage to the nominated port or place of loading or discharge the Master finds that the port — 367
or place is inaccessible owing to ice he shall immediately request Charterers by radio for revised orders and — 368
remain outside the area of ice-bound water. The terms governing such time awaiting orders shall be in — 369
accordance with the provisions of Clause 24. Upon receipt of such request Charterers shall give orders for — 370
the Vessel to proceed to an alternative ice-free and accessible port or place where there are facilities for — 371
receiving or delivering the cargo. In this event freight shall be paid at the rate applicable under this — 372
Charter to such alternative loading or discharge port or place, and any period by which the steaming time — 373
taken to reach such alternative port or place exceeds the time which should have been taken had the Vessel — 374
proceeded thither direct shall count as laytime or, if the Vessel is on demurrage, as demurrage. — 375

Ice at Loading/    30.    If, on or after the Vessel's arrival at a nominated port or place of loading or discharge, there is a — 376
Discharge Ports    danger of the Vessel being frozen in, the Master shall proceed to the nearest safe and ice-free position and — 377
or Places    at the same time request Charterers by radio for revised orders. Upon receipt of such request Charterers — 378
shall give orders for the Vessel either to proceed to an alternative ice-free and accessible port or place, — 379
where there is no danger of the Vessel being frozen in and where there are facilities for receiving or — 380
delivering cargo, or to return to and load or discharge at the nominated port or place. If the Vessel is — 381
ordered to an alternative port or place the sum in respect of freight and delay to be paid by Charterers shall — 382
be as provided in Clause 29, but if the Vessel loads or discharges at the nominated port or place, then, — 383
subject to the provisions of Clauses 19, 20 and 21, the whole of the time occupied from the receipt of Notice — 384

9

of Readiness to load or discharge on the Vessel's first arrival until hoses are disconnected after the | 385
completion of loading or discharge shall count as laytime, or if the Vessel is on demurrage, as demurrage. | 386
Any delay after the final disconnection of shore hoses caused by ice by reason of the Vessel returning to the | 387
nominated port or place on Charterers' Instructions shall count as laytime or, if the Vessel is on | 388
demurrage, as demurrage. | 389

**Quarantine**    31. Should Charterers require the Vessel to proceed to any port or place at which, at the time the Vessel | 390
is ordered to that port or place, there is quarantine time shall count as laytime or, if the Vessel is on | 391
demurrage, as demurrage whilst the Vessel is detained, but should quarantine be declared only whilst the | 392
Vessel is on passage to the port or place Charterers shall not be liable for any delay caused by such | 393
quarantine. | 394

**Lien**    32. Owners shall have a lien upon the cargo for all freight, deadfreight, demurrage and the cost of | 395
recovery thereof. | 396

**Documentation**    33. Owners undertake that throughout the currency of this Charter the Vessel shall have on board all | 397
such valid documentation as may, from time to time, be required to enable the Vessel to enter and carry out | 398
all required operations at loading or discharge ports or places and leave, without let or hindrance, all ports | 399
or places to which the Vessel may be directed under the terms of this Charter and Owners hereby expressly | 400
confirm:- | 401

(a) that they shall be responsible for any loss, damage, delay or expenses; and | 402

(b) that time shall not count as laytime or, if the Vessel is on demurrage, as demurrage for any period | 403
during which the Vessel is not fully and freely available to Charterers; | 404

as a result of action taken against her by any Government, Government Organisation, competent | 405
authority, person or organisation, owing to her flag, failure to have on board valid documentation as | 406
aforesaid or any dispute relating to Owners' wages or crew employment policy or to the condition of the | 407
Vessel or her equipment. | 408

**Calls at
Sullom Voe**    34. (a) Notwithstanding Clause 45 as from the date of agreement to, and for the duration of, this | 409
Charter Owners and their agents shall observe Charterers' Instructions regarding the disposal of ballast | 410
from the Vessel. For such period as aforesaid Owners shall ensure that no engine room, pumproom or | 411
other oily effluent is discharged from the Vessel and shall, if required by Charterers, produce evidence of | 412
instructions cabled by them to the Master forbidding the discharge of such effluent from the Vessel. | 413
Charterers shall pay any deadfreight arising by reason of compliance with Charterers' Instructions. If, | 414
before the commencement of loading at Sullom Voe Terminal, Charterers produce to Owners evidence of | 415
non-compliance with such instructions regarding the disposal of ballast or evidence of the discharge, or | 416
apparent discharge, of such effluent Charterers may, by notice in writing, cancel this Charter without | 417
incurring any liability for damages. | 418

(b) Owners warrant that the Vessel is capable of accepting cargo at the following minimum acceptance | 419
rates and of deballasting within the following maximum periods:- | 420

| | | | |
|---|---|---|---|
| | | | 421 |
| | Minimum | Maximum | 422 |
| Ship's size | Cargo Acceptance Rate | Deballasting Period | |
| Up to 89,999 tons SDWT | 7.5 per cent of SDWT/Hour | 5 hours 30 minutes | 423 |
| 90,000 tons to 179,999 tons SDWT | 6.6 per cent of SDWT/Hour | 8 hours 40 minutes | 424 |
| Over 180,000 tons SDWT | 5.8 per cent of SDWT/Hour | 11 hours 10 minutes | 425 |

Should the Vessel's cargo acceptance rate be less than the relevant minimum rate specified above or should | 426
the deballasting time specified above exceed the relevant maximum period the excess time required to | 427
complete loading shall be deducted from any laytime or demurrage accruing under the provisions of this | 428
Charter. | 429

(c) Owners warrant that the Vessel shall present manifolds of 16 inch diameter, class ANSI 150 with a | 430
minimum 500 mm between flanges or reducer/spool pieces such that the quick closing coupler may operate | 431
without restrictions. | 432

**Calls at
Nigerian Ports**    35. Owners warrant that the Vessel is neither directly nor indirectly owned and/or chartered by South | 433
African, Namibian, Zimbabwean or Israeli companies or persons, that the Vessel is not registered in any of | 434
the aforementioned States and that the Vessel is not linked, by means of financial arrangements or | 435
mortgages, with such States. | 436

Owners warrant that the Master, officers and crew and any supernumeraries or passengers do not, and | 437

10



shall not, include nationals of any of the aforementioned States or persons who were born in, or reside in, any of such States.    438 / 439

Owners warrant that the Vessel has not called at or off any port in South Africa, Namibia, or Israel within the last 2 years prior to her arrival in Nigerian waters. A port of call in this context includes calling at or off a port to receive services such as mail and/or provisions whether by helicopter or launch and not merely discharging, loading, repairing or bunkering.    440 / 441 / 442 / 443

Owners warrant that no stores, spare parts, provisions and packing of material on board emanate from any of the States referred to in the first paragraph of this Clause.    444 / 445

**Bills of Lading and Indemnities**    36. Bills of Lading shall be signed as Charterers direct, without prejudice to this Charter. Charterers hereby indemnify Owners -    446 / 447

(a) against all liabilities that may arise from the signing of Bills of Lading in accordance with the directions of Charterers to the extent that the terms of such Bills of Lading impose more onerous liabilities than those assumed by Owners under the terms of this Charter; and    448 / 449 / 450

(b) against claims brought by holders of Bills of Lading against Owners by reason of any deviation required by Charterers under the provisions of Clauses 24 and 26.    451 / 452

All Bills of Lading issued under this Charter shall contain War Risks, Both-to-Blame Collision and New Jason clauses.    453 / 454

**Unavailability of Bills of Lading Change of Receiver Change of Discharge Port or Place**    If a Bill of Lading is not available at any discharge port or place to which the Vessel may be ordered by Charterers under this Charter or if Charterers require Owners to deliver cargo to a party and/or at a port or place other than as set out in the Bills of Lading, then Owners shall nevertheless discharge the cargo carried by the Vessel in compliance with Charterers' instructions, upon a consignee nominated by Charterers (hereinafter called "the Receiver") presenting reasonable identification to the Master, in consideration of the following undertakings by Charterers:-    455 / 456 / 457 / 458 / 459 / 460

(i) to indemnify Owners (which term shall, for the purpose of this Clause, include Owners' servants and agents) and to hold Owners harmless in respect of any liability, loss or damage of whatsoever nature which Owners may sustain by reason of delivering the cargo to the Receiver in accordance with Charterers' instructions;    461 / 462 / 463 / 464

(ii) to provide Owners, in the event of any proceedings being commenced against Owners in connection with the delivery of the cargo as aforesaid, from time to time on demand, with sufficient funds to defend the same;    465 / 466 / 467

(iii) to provide Owners on demand such bail or other security as may be required if, in connection with the delivery of the cargo as aforesaid, the Vessel or any other vessel or property belonging to Owners should be arrested or detained or, if the arrest or detention thereof should be threatened, to prevent such arrest or detention, or to secure the release of such Vessel or property and to indemnify Owners in respect of any loss, damage or expenses caused by such arrest or detention whether or not the same be justified; and    468 / 469 / 470 / 471 / 472

(iv) to produce and deliver to Owners all original Bills of Lading in respect of the cargo loaded by the Vessel as soon as same shall have arrived and/or come into the possession of Charterers whereupon Charterers' liability hereunder shall cease.    473 / 474 / 475

The provisions of the foregoing undertakings shall be governed by English Law.    476

**Coding of Cargo Documentation - US Customs Regulations**    37. If Charterers require the Vessel to load or discharge at a port or ports within the jurisdiction of the US Customs Service, Owners shall procure that the Master complies with Charterers' instructions as to the insertion of Owners' Unique Identifier in each Bill of Lading accompanying a shipment of imported cargo in accordance with US Customs Regulations (19 CFR Parts 4 and 178). Owners shall provide Charterers or their agents on request with details of their Unique Bill of Lading Identifier in respect of any cargo carried hereunder.    477 / 478 / 479 / 480 / 481 / 482

In the event that the Master fails to comply with Charterers' instruction as aforesaid Owners shall be liable for any delays resulting therefrom and any time lost thereby shall not count as laytime or, if the Vessel is on demurrage, as demurrage.    483 / 484 / 485

**Liberty**    38. The Vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress, to call at any port or ports for bunkers, and to deviate for the purpose of saving life or property, or for any other reasonable purpose.    486 / 487 / 488

11

**Agency** 39.  Charterers shall nominate the Vessel's agents at loading and discharge ports or places but such agents shall be employed, instructed and paid by Owners. 489
490

**Estimated Times of Arrival** 40.  If the Master fails to comply with any of the following provisions any delay, either at a loading or discharge port or place, resulting therefrom shall not count as laytime or, if the Vessel is on demurrage, as demurrage and Owners shall be responsible for any additional costs incurred by Charterers arising from such non-compliance. 491
492
493
494

The Master shall send messages by radio or telex to Charterers addressed 'BP Shipping London' and to the agents at the loading port or place advising the date and approximate hour of the Vessel's arrival. Such messages shall be sent upon the Vessel's sailing from the prior discharge port and 7 days and 72, 48 and 24 hours prior to the Vessel's estimated arrival at the loading port or place. Should the Vessel be at sea or elsewhere when ordered by Owners to proceed to the loading port or place the Master shall, if the Vessel is less than 7 days or 72/48/24 hours, as applicable, from the loading port or place, immediately notify Charterers and the agents of the Vessel's ETA in the manner aforesaid and thereafter notify Charterers and the agents of the Vessel's ETA at such of the times as aforesaid as are applicable or immediately provide Charterers with such other ETAs as Charterers may request. 495
496
497
498
499
500
501
502
503

The Master shall notify Charterers and the agents of the Vessel's ETA at the discharge port or place in the manner aforesaid also providing information as to the Vessel's expected arrival draught on even keel salt water either upon the Vessel leaving the previous port or place or 72 hours prior to her estimated arrival at the discharge port or place, whichever is the later. Thereafter the Master shall notify Charterers and the agents of the Vessel's ETA together with the information as aforesaid 48 and 24 hours, as applicable, from the discharge port or place or immediately provide Charterers with such other ETAs as Charterers may request. 504
505
506
507
508
509
510

The Master shall advise Charterers and the agents promptly by radio or telex of any variation of more than 6 hours in estimated dates or times of arrival at the loading and/or discharge port or place. 511
512

Should the voyage involve passing the Cape of Good Hope the Master shall, on passing the Cape of Good Hope, send an additional radio or telex message to Charterers, advising the Vessel's ETA off Land's End or at the discharge port or place if already nominated, stating also the estimated arrival draught on even keel salt water. 513
514
515
516

Charterers shall have the right to see copies of all telexes (showing answerbacks) referred to in this Clause. 517

**Sub-Charter** 41.  Charterers may sub-charter the Vessel without prejudice to the respective rights and obligations of either party under this Charter. 518
519

**Cargo Insurance** 42.  Any additional premium which might be placed on the cargo insurance by reason of the Vessel's age and/or condition shall be for Owners' account, and Charterers shall be entitled to deduct the cost of any such additional premium from the freight. 520
521
522

**Bunker Fuel** 43.  If the supply of bunker fuel required for the voyage performed under this Charter should not at the material date be covered under a contract between Owners and any of the BP Group of Companies, the first option of supplying such bunker fuel shall be given by Owners to a Company within the BP Group. 523
524
525

**Traffic Separation and Routing** 44.  Owners shall instruct the Master to observe recommendations as to traffic separation and routeing as issued from time to time by the International Maritime Organisation or as promulgated by the State of the flag of the Vessel or the State in which the effective management of the Vessel is exercised. 526
527
528

**Oil Pollution Prevention** 45.  Owners shall instruct the Master to retain on board all oily residues of oil of a persistent nature remaining in the Vessel from the previous cargo. The Master shall, during tank washing, collect the washings into one cargo compartment and after maximum separation of the free water, discharge the water so separated overboard, in the discharge of all water separated as aforesaid Owners shall comply with the requirements of the International Convention for the Prevention of Pollution from Ships 1973, as amended by its Protocol of 1978 (MARPOL 73/78), insofar as these do not conflict with any applicable law. 529
530
531
532
533
534

When this operation is completed the Master shall notify Charterers by radio of the estimated tonnage of all segregated tank washings from previous cargoes. 535
536

**Treatment of Tank Washings** On the Vessel's arrival at the loading port or place the Master shall arrange that the quantity of all segregated tank washings shall be measured in conjunction with cargo suppliers and shall make a note in the Vessel's ullage record of the quantity so measured. 537
538
539

If Charterers require the Master to load the cargo on top of the segregated tank washings, freight    540
calculated in accordance with Clause 6 shall be paid on that quantity of the tank washings up to a tonnage    541
equivalent of 1% of the Vessel's summer deadweight. Owners shall instruct the Master to keep the water    542
to a minimum and in any event not exceeding 0.15% of the Vessel's summer deadweight tonnage.    543

If Charterers require the Master to segregate the tank washings from the cargo to be loaded, Charterers    544
shall pay for any deadfreight so incurred.    545

If, for whatever reason, the cargo loaded hereunder is not loaded on top of the segregated tank washings    546
from previous cargoes (or any part thereof), Owners undertake that all such washings shall be discharged    547
or disposed of or retained in accordance with the orders and directions of Charterers on completion of the    548
voyage hereunder.    549

Exceptions    46.   The provisions of Articles III (other than Rule B), IV, IV bis and VIII of the Schedule to the Carriage    550
of Goods by Sea Act, 1971 of the United Kingdom shall apply to this Charter and shall be deemed to be    551
inserted in extenso herein. This Charter shall be deemed to be a contract for the carriage of goods by sea to    552
which the said Articles apply, and Owners shall be entitled to the protection of the said Articles in respect    553
of any claim made hereunder.    554

Charterers shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or    555
damage or delay or failure in performance hereunder arising or resulting from Act of God, act of war,    556
seizure under legal process, quarantine restrictions, labour disputes, strikes, riots, civil commotions, arrest    557
or restraint of princes, rulers or peoples.    558

War Risks    47.   (a) The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for    559
any port which the Master or Owners in his or their discretion consider dangerous or impossible to enter    560
or reach.    561

(b) If    562
(i) any port of loading or of discharge named in this Charter or to which the Vessel may properly be    563
ordered pursuant to the terms of this Charter or the Bills of Lading be blockaded; or    564

(ii) owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, or the    565
operation of international law:-    566

(aa) entry to any such port of loading or of discharge or the loading or discharge of cargo at any port    567
be considered by the Master or Owners in his or their discretion dangerous or prohibited, or    568

(bb) it be considered by the Master or Owners in his or their discretion dangerous or impossible for    569
the Vessel to reach any such port of loading or of discharge,    570

then Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or    571
discharged at any other port of loading or of discharge whether within or outside the range of loading or    572
discharge ports respectively established under the provisions of this Charter (provided such other port is    573
not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Own-    574
ers' discretion dangerous or prohibited). If no orders be received from Charterers within 48 hours after    575
they or their agents have received from Owners a request for the nomination of a substitute port, then:    576

if the affected port is the first and only loading port and no cargo has been loaded, this Charter    577
shall terminate forthwith;    578

if the affected port is a loading port and part of the cargo has already been loaded, the Vessel    579
may proceed on passage and Charterers shall pay for any deadfreight so incurred;    580

if the affected port is a discharge port, Owners shall be at liberty to discharge the cargo at any safe    581
port which they or the Master may in their or his discretion decide on (whether within or outside the    582
range of discharge ports established under the provisions of this Charter or) and such discharge    583
shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so    584
discharged is concerned.    585

In the event of the cargo being loaded or discharged at any such other port within the respective range of    586
loading or discharge ports established under the provisions of this Charter, this Charter shall be read in re-    587
spect of freight and all other conditions whatsoever as if the voyage performed were that originally    588
designated. However if the Vessel discharges the cargo at a port outside the range of discharge ports estab-    589
lished under the provisions of this Charter, freight shall be paid as for the voyage originally designated and    590
all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat    591

### 13

shall be paid by Charterers'. In the latter event Owners shall have a lien on the cargo for all such extra expenses. 592 / 593

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done such shall not be deemed a deviation. 594–601

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfilment of the contract or contracts of affreightment and Owners shall be entitled to freight as if discharge had been effected at the port or ports originally designated or to which the Vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by Charterers and Owners shall have a lien on the cargo for freight and all such expenses. 602–610

In to Blame Collision

48.   If the liability for any collision in which the Vessel is involved while performing this Charter falls to be determined in accordance with the laws of the United States of America, or the laws of any State which applies laws similar to those applied in the USA in the circumstances envisaged by this Clause, the following Clause shall apply:- 611–614

"If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the Vessel, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of, said goods, paid or payable by the other or non-carrying vessel or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying vessel or carrier. 615–622

The foregoing provisions shall also apply where the owner, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of collision or contact." 623–625

Whilst Charterers shall procure that all Bills of Lading issued under this Charter shall contain a provision in the foregoing terms, to be applicable where the liability for any collision in which the Vessel is involved falls to be determined in accordance with the preamble of this Clause, Charterers neither warrant nor undertake that such provision shall be effective. In the event that such provision proves ineffective Charterers shall, notwithstanding anything to the contrary herein provided, not be obliged to indemnify Owners. 626–631

General Average   49.   General Average shall be adjusted and settled in London in accordance with the York/Antwerp Rules 1974 or any modification or re-enactment thereof for the time being in force. 632 / 633

New Jason   50.   If, notwithstanding Clause 49, it is agreed in writing that General Average adjustment be made in accordance with the law and practice of the United States of America, the following Clause shall apply:- 634 / 635

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. 636–641

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo shippers, consignees or owners of the cargo to the carrier before delivery". 642–645

| FMC Certificate/ US Coastguard Regulations | 51. Owners undertake that the Vessel carries on board a valid US Coast Guard Certificate of Financial Responsibility as required under the US Federal Water Pollution Control Act as amended by the Clean Water Act of 1977. Any delay arising from failure by Owners to have such a Certificate on board the Vessel shall not count as laytime or, if the Vessel is on demurrage, as demurrage. | 646 647 648 649 |

Owners warrant that during the period of this Charter the Vessel shall comply with all applicable US Coast Guard Regulations and that if in any respect whatsoever the Vessel does not so comply there shall be on board the Vessel appropriate waivers from the US Coast Guard. Any delay arising from non-compliance with the foregoing provision shall not count as laytime or, if the Vessel is on demurrage, as demurrage.    650 651 652 653

Clause Paramount        52. All Bills of Lading issued under this Charter shall contain the following Clause Paramount:-    654

"CLAUSE PARAMOUNT    655

This Bill of Lading shall:    656

(1) In relation to the carriage of any goods from any port in Great Britain or Northern Ireland to any other port whether in or outside Great Britain or Northern Ireland have effect subject to the provisions of the Carriage of Goods by Sea Act 1971 and to the Rules contained in the Schedule thereto (the Hague/Visby Rules) and nothing herein contained shall be deemed a surrender by the Carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the said Act;    657 658 659 660 661

(2) In relation to the carriage of any goods from any port in a state in which legislation similar in effect to the Carriage of Goods by Sea Act 1971 of the United Kingdom is in force to any port in any other state, have effect subject to such legislation and to the Rules contained in the Schedule thereto and nothing herein contained shall be deemed a surrender by the Carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the said legislation;    662 663 664 665 666

(3) In relation to the carriage of any goods between ports in two different states, where this Bill of Lading is issued in Great Britain, Northern Ireland or any state in which legislation similar in effect to the Carriage of Goods by Sea Act 1971 of the United Kingdom is in force have effect subject to such Act or such legislation and to the Rules contained in the Schedule thereto and nothing herein contained shall be deemed a surrender by the Carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the said Act or said legislation;    667 668 669 670 671 672

(4) In any other case have effect as if the contract of carriage herein contained were a contract of carriage to which the provisions of the Carriage of Goods by Sea Act 1971 of the United Kingdom applied and the Carrier shall be entitled to the benefit of the privileges, rights and immunities conferred by the said Act and the Rules contained in the Schedule thereto as if the same were herein specifically set out.    673 674 675 676

Notwithstanding the foregoing provisions of this Clause the Hague/Visby Rules shall not apply to this contract where the goods carried hereunder consist of cargo which by this contract is stated as being carried on deck and is so carried.    677 678 679

If any term of this Bill of Lading be repugnant to the provisions of the Hague/Visby Rules such term shall be void to that extent but no further."    680 681

TOVALOP        53. Owners warrant that the Vessel is a Participating Tanker in TOVALOP and will so remain during this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers, from withdrawing from TOVALOP under Clauses III(B) or X thereof, and provided further that upon any withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not materially increase the obligations of the Parties thereunder, Charterers shall have the option to terminate this Charter.    682 683 684 685 686 687

When an escape or discharge of Oil occurs from the Vessel and causes or threatens to cause Pollution Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred would create a serious danger of Pollution Damage), then Charterers may, at their option, upon notice to Owners or the Master, undertake such measures as are reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such measures taken by them, and, if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority and as Owners' agent and shall be at Owners' expense except to the extent that:    688 689 690 691 692 693 694 695 696

(a) any such escape or discharge or Threat was caused or contributed to by Charterers; or    697

15.



(b) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are, or, had the said Convention applied to such escape or discharge or to the Threat, would have been, exempt from liability for the same; or                  698
699
700

(c) the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty U.S. Dollars per ton or Sixteen Million Eight Hundred Thousand U.S. Dollars, whichever is the lesser, save insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners' limit of liability hereunder shall be that provided for in the said Supplement;                  701
702
703
704
705
706
707

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause and all further liability to Charterers under this Clause shall thereupon cease.                  708
709
710
711

The above provisions are not in derogation of such other rights as Charterers or Owners may have under this Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.                  712
713

For the purposes of this Clause, the meaning of the terms "Oil" and "Pollution Damage" shall be as defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.                  714
715

The BP Shipping         54.   During pre-fixture negotiations leading to agreement between Owners and Charterers to the terms
Questionnaire       and conditions of this Charter Owners have, either in consultation with their brokers or otherwise,
provided Charterers with a completed BP Shipping Questionnaire a copy of which shall be attached hereto
as Appendix I.                  716
717
718
719

Owners warrant that the responses to the BP Shipping Questionnaire provided by or on behalf of them are correct. If any response as provided by or on behalf of Owners proves to be incorrect Charterers shall be entitled either:-                  720
721
722

(a) to cancel this Charter forthwith without prejudice to any other rights available to them under this Charter or otherwise under English Law; or                  723
724

(b) to recover, by deduction from freight, any losses, costs, damages or expenses incurred as a direct result of Owners' breach of warranty.                  725
726

In the event of any conflict arising between any provision(s) in the body of this Charter and any provision(s) in Appendix 1 the provision(s) contained in the body of this Charter shall prevail.                  727
728

Law         55.   The construction, validity and performance of this Charter shall be governed by English Law. The
High Court in London shall have exclusive jurisdiction over any dispute which may arise out of this
Charter.                  729
730
731

*In Witness Whereof* the parties have caused this Charter to be executed as of the date first above written

........................................................................................................................................................

for and on behalf of

...............................................................................................................................OWNERS

........................................................................................................................

for and on behalf of BP SHIPPING LIMITED as agents for

............................................................................................................... CHARTERERS

KARRAN TANKERS AMENDMENTS / ADDITIONAL CLAUSES TO
BEEPEEVOY3 CARTER PARTRY (TOWER)

## AMENDMENTS

### CL 4 LIGHTENING AT SEA
In line 74 after "CL 19", insert "unless so defined by WS Association or other authority having jurisdiction".

### CL 19 LAYTIME
Lines 283, 286 delete "2 hours", insert "3 hours".

### CL 34 CALLS AT SULLOM VOE
Delete in full from line 409 till line 433 inclusive.

### CL 35 CALLS AT NIGERIAN PORTS
Delete in full from line 434 till line 446 inclusive.

### CL 36 BILLS OF LADING AND INDEMNITIES.
Lines 474, 475, 476 delete and insert "This indemnity shall become null and void against presentation of 1/3 Bills of Lading, or after 13 months after completion of discharge, whichever occurs first, provided within such 13 months no legal proceedings have been instituted against Owners.

### CL 40 ESTIMATED TIME OF ARRIVAL
Line 496 delete "addressed BP Shipping".

### CL 43 BUNKER FUEL
Deleted in full.

### CL 49 GENERAL AVERAGE
Line 633 after "Rules 1974" insert "as amended 1990".

### CL 52 PARAMOUNT
As amended 1992
All Bills of Lading issued under this charter shall contain the following Clause Paramount:
(1) This Bill of Lading shall have effect subject to any national law making the International Convention for the Unification of certain rules of law relating to Bills of Lading signed at Brussels on 25th August 1924 (The Hague Rules) or the Hague Rules as amended by the Protocol signed at Brussels on 23rd February 1968 (the Hague /Visby Rules) compulsorily applicable to this Bill of Lading. If any terms of this Bill of Lading repugnant to that legislation to any extent, such term shall be void to that extent but no further. Neither the Hague Rules nor the Hague/Visby Rules shall apply to this contract where the goods carried hereunder consist of live animals or cargo which by this contract is stated as being carried on deck and is so carried.
(2) Safe where the Hague or Hague/Visby Rules apply by reason of (1) above, this Bill of Lading shall take effect subject to any national law in force at the port of shipment or place of issue of the Bill of Lading making the United Nations Convention on the Carriage of Goods by Sea 1978 (the Hamburg Rules) compulsory applicable to this Bill of Lading in which case this Bill of Lading shall have effect subject to the Hamburg Rules which shall nullify any stipulation derogating therefrom to the detriment of the shipper or consignee.

## KARRAN TANKERS AMENDMENTS / ADDITIONAL CLAUSES TO
## BEEPEEVOY3 CARTER PARTRY (TOWER)

(3) Where the Hague, Hague/Visby or Hamburg Rules are not compulsorily applicable to this Bill of Lading, the carrier shall be entitled to the benefits of all privileges, rights and immunities contained in Articles I to VIII of the Hague Rules, safe that the limitation sum for the purposes of Article IV Rule 5 of the Hague Rules shall be 100 pounds sterling.

- CL 53 TOVALOP
  Delete in full from line 683 till line 716 inclusive.
  (See clause 60)

- CL 55 LAW
  Delete last sentence and insert instead: "ASBATANKVOY arbitration clause to apply with Arbitration in the City of London".

### *ADDITIONS*

- CL 56 CONFIDENTIALITY: This fixture is to be kept strictly private and confidential and is not to be reported.

- CL 57 CLEAN BALLAST: The vessel to arrive at loading port with clean ballast. Where shore facilities for ballast are provided any expenses and time in connection with discharging ballast ashore to be for Owners' account. No WS differential for discharging dirty ballast ashore is applicable.

- CL 58 ADHERANCE TO VOYAGE INSTRUCTIONS: Owners are responsible for Master's/Vessel's non compliance with voyage orders given under this charter party and any time lost as a result of failure to comply not to be for Charterers' account.

- CL 59 IN-TRANSIT-LOSS: Owners will be responsible for the full amount of any in-transit-loss exceeds 0.3 % and Charterers shall have the right to deduct from freight an amount equal to the FOB Port-of-loading-value of such cargo plus freight due with respect thereto. In-transit-loss is defined as the difference between vessel's volumes after loading at the loading port and before unloading at the discharge port. Pumpable cargo shall not constitute an actual loss. Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.

- CL 60 ITOPF: Owners warrant that throughout the duration of this Charter the vessel will be:
  I)    owned or demise chartered by a member of the International Tanker Owners Pollution Federation Limited and,
  II)   entered in the following protection and indemnity club:
        ....................................................................................................................

- CL 61 ADDITIONAL OIL POLLUTION INSURANCE: Owners warrant that throughout the duration of performance under this Charter:
  A) the vessel carries on board a valid certificate of insurance as described in the 1969 Civil Liability Convention for Oil Pollution Damage and the International Convention on Civil Liability for Oil Pollution Damage 1992;

BP PEEVOYS CARTER PARTRY (TOWER)

B) the vessel has in place insurance cover for oil pollution no less in scope and amount than the highest available under the Rules of P&I Clubs entered into the International Group of P&I Clubs (currently USD 1,0 billion).

CL 62 DRUG AND ALCOHOL: Owners warrant that they comply with the OCIMF Guidelines for the control of drug and alcohol onboard ships, issued January 1990.

CL 63 FREE PRATIQUE: Immediately upon vessel's arrival Master is to make a written request for free pratique. Should same not be granted within maximum 6 hours from vessel's arrival then master to tender a written protest to this effect. Copies of Master's request and protest will be required by Charterers in support of any eventual demurrage claim.
Charterers will not be responsible for time lost as a result of Master's failure to comply with the foregoing.

CL 64 ISM COMPLIANCE CLAUSE
Owners guarantee that this vessel complies fully with the ISM Code and is in possession of a valid safety Management Certificate and will remain so for the entirety of her employment Under this Charter Party.
Owners will provide Charterers with satisfactory evidence of compliance if required to do so and will remain fully responsible for any and all consequences arising directly from any matters arising out of non compliance with this clause.

CL 65 BP ADMINISTRATION CLAUSE
Charter Party terms and conditions are evidenced by the fixing confirmation telex sent (or issued) by the broker. Owners and Charterers shall each confirm their approval of the confirmation telex by return telex to the broker within one business day after lifting subjects. The broker shall then confirm receipt of said confirmation to both parties. Except as requested in writing by either Owner or Charterer, there shall be no formal written and signed Charter Party.

CL 66 ADDRESS COMMISION



24.    ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a dis-interested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearing either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.